196 So. 96

## VERNON v. STATE.

### 6 Div. 460.

Supreme Court of Alabama.

March 28, 1940.

Rehearing Denied May 21, 1940.

Cora R. Thompson, of Birmingham, for appellant.

Thos. S. Lawson, Atty. Gen., and Prime F. Osborn, Asst. Atty. Gen., for the State.

BROWN, Justice.

The appellant, Joe Vernon, of the negro race, was prima facie regularly indicted in the Circuit Court of Jefferson County, and on his arraignment and trial was represented by able and experienced counsel of his own selection and employment, and on said trial was convicted as particeps criminis in the murder of Bennie Montgomery.

On said trial numerous and sundry questions were raised and reserved for review on this appeal, but no objection was made and no question was raised on or before the trial as to the formation of the grand jury that presented the indictment or its legality. Nor was there any objection to the venire for his trial or the formation of the petit jury selected and empanelled for this trial. The indictment, as the record shows, was returned and filed in open court November 12, 1938; the defendant was arraigned and entered a plea of not guilty, December 31, 1938, and the case was set specially to be tried on January 9, 1939. The trial was entered upon on the day set therefor without objection or motion for continuance, or motion for postponement; the verdict of guilty was rendered on the 10th of January, and the judgment entered and sentence pronounced on the 12th of January, 1939.

On the 9th of February, 1939, the defendant filed a motion for new trial, cataloguing 21 grounds, mostly for alleged errors in refusing special instructions, rulings on evidence and alleged misconduct of the solicitor in argument.

The 8th ground: "For that the verdict was against the weight of the evidence."

9. "For that it was error to force the defendant to trial in a cause of this serious a nature, by trying it before it [its] turn on the docket."

19. "For that the defendant, Joe Vernon, being a negro, it was error to force the defendant to be compelled to select from a venire composed solely of white men."

20. "For that it invaded the Constitutional rights of the defendant, Joe Vernon, in that he was forced to select the jury from men composed entirely of white men."

21. The same as 20.

The motion was regularly continued from time to time until the 1st of April, 1939, when the defendant filed additional grounds numbered from 22 to 38, some of which go to the question stated more fully in ground 38, than any other.

"For that, the defendant, being a negro and indicted for the murder of a white man; that at least one-third of the population of the County from which the Grand and Petit Juries were drawn were members of the negro race, and that the general venire contained no names of negroes when the Grand Jury that indicted petitioner was drawn; or that there were so few as to be a denial of the rights of petitioner when considered in conjunction with the number of negroes and the number of white people drawn on the venire or the number that ought to have been drawn to preserve a proper ration [ratio] to be a compliance with the 14th Amendment to the Constitution of the United States, and that the State officers charged by law with the duty of providing names for the general venire had 'deliverately excluded therefrom, or so small a number had been drawn as to be an exclusion, of any negroes qualified to serve as Grand or Petit Jurors, and had done so systematically, unlawfully and unconstitutionally for a long period of time solely and only because of their race and color' was denied the equal protection of the laws guaranteed him by the 14th Amendment of the Constitution of the United States."

The motion for new trial was then continued until the 11th of April, and on that date, on motion of the solicitor the circuit court expunged or struck from the original motion said grounds 19, 20 and 21, and struck from the files said paper containing grounds 22 to 38, inclusive, and to these rulings the defendant reserved sepa-

rate exceptions. The motion for new trial was then overruled.

█ It is well settled that objections going to the formation of the grand jury which presented the defendant must be made by plea in abatement before pleading not guilty, and after so pleading, any such objection is addressed to the irrevisible discretion of the trial court. Nixon v. State, 68 Ala. 535; Jackson v. State, 74 Ala. 26; Hubbard v. State, 72 Ala. 164.

█ So, also, that objections going to the venire of the petit jury or any member thereof, must be made before entering upon the trial of the case on its merits under the defendant's plea of not guilty, and a failure to make such objections constitutes a waiver. Peterson v. State, 227 Ala. 361, 150 So. 156. This rule has its exceptions as when the defendant is misled by the false oath and fraud of a venireman, and thereby induced to accept such venireman on the jury. 20 R.C.L. 242, § 27.

It is not permissible for the defendant, who has not been so misled, to participate in the selection of the jury without objections, speculate on winning a favorable verdict, and failing to do so, allow him to raise such questions on a motion for new trial. Simpson v. Golden, 114 Ala. 336, 21 So. 990; Hoskins v. Hight, 95 Ala. 284, 11 So. 253; Barron v. Robinson, et al., 98 Ala. 351, 13 So. 476; Fulwider v. Jacob, 221 Ala. 124, 127 So. 818.

We observe that there is nothing in the record going to show that defendant and his counsel were not fully informed and had knowledge of the facts averred in said several grounds when he entered his plea and entered upon the trial. See Fulwider v. Jacob, supra.

█ Applying these well-settled rules of law, we are not of opinion that error was committed by the circuit court in striking from the motion for new trial the grounds that sought to question the formation of the grand jury that returned the indictment, and the petit jury selected and empanelled for the defendant's trial.

█ As for the ground of the motion for new trial "For that the verdict was against the weight of the evidence," the rule applicable is: "Unless, after allowing all reasonable presumption of its [the verdict's] correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it is wrong and unjust," the trial court will not be held to have erred in overruling the motion. Caldwell v. State, 203 Ala. 412, 84 So. 272, 278; Jordan v. State, 225 Ala. 350, 142 So. 665.

█ After full consideration of the evidence we are of opinion that the evidence is sufficient to support the verdict, and as for this ground, the motion was overruled without error.

The other questions argued, so far as they merit treatment, were raised during the trial and appear in the bill of exceptions outside of the motion for new trial, and will be so considered.

One of the defendant's major contentions is that there is an absence of evidence in proof of the corpus delicti, independent of the evidence of the defendant's confessions, and therefore the confessions were not admissible.

The evidence shows that the deceased, Bennie Montgomery, was a school boy living with his widowed mother in the community of the filling station where he worked, part time; that on the night he was killed he was left alone in charge of the station where motor fuels were sold until the usual closing hour, from 9 to 10 o'clock, with cash sufficient to make change as purchases were made. About 9 o'clock what sounded like a muffled shot was heard at or near the filling station; that such occurrence was not unusual and the witness who testified to hearing the shot made no investigation at the time. Between 3 and 4 o'clock next morning Montgomery's body was discovered by the morning news boy while delivering the paper at the filling station, and reported the fact to the police.

The evidence shows that all merchandise kept on the outside for display during business hours had been moved inside, all lights, except the light at the front door, had been extinguished indicating that Montgomery was in the act of closing the station for the night. Deceased's body, in rigor mortis, was just inside and back of the door resting on the knees with face and hands resting on the floor in a pool of blood. The physical facts show that deceased had been shot, the bullet entering under the arm, passed through the body and lodged inside of deceased's shirt. No weapon was found near the body or on the premises.

█ The appellant's contention is that these facts are not sufficient in proof of the corpus delicti to permit the introduction in evidence of the defendant's confession, though it be shown to be voluntary; that

the evidence must go further and tend to identify the accused as the guilty agent applying unlawful force causing death. This is not the law. Proof of the identity of the accused is not an essential part of the corpus delicti. Proof of death resulting from force unlawfully applied is all that the law requires, as a predicate for the introduction of a confession voluntarily made. Simmons v. State, 16 Ala.App. 645, 81 So. 137; Shelton v. State, 217 Ala. 465, 117 So. 8; Jordan v. State, 225 Ala. 350, 142 So. 665.

Extrajudicial confessions of guilt by an accused on trial for crime are prima facie involuntary, and the burden rests upon the state to overcome this prima facie infirmity by evidence satisfactory to the court trying the case that the confession was voluntarily made, before such confession can be received in evidence. It is the right of the accused to controvert evidence offered in laying such predicate by cross-examination, or by evidence aliunde, but such countervailing evidence impeaching the predicate to be successful must be offered on the voir dire, before the confession is admitted. Lockett v. State, 218 Ala. 40, 117 So. 457; Cook v. State, 16 Ala.App. 390, 78 So. 306; Pope v. State, 183 Ala. 61, 63 So. 71; Jackson v. State, 83 Ala. 76, 3 So. 847.

If such countervailing evidence is not offered until after the preliminary question of the admissibility of the confession is passed on by the court it goes to the jury on the credibility of the confession only. Lockett v. State, supra; Cook v. State, supra.

When the evidence going to show that such confession was voluntary is conflicting and the trial court holds that it was voluntary, such holding is entitled to great weight on appeal, not to be disturbed unless such holding is palpably contrary to the weight of the evidence. Pope v. State, supra; Harwell v. State, 12 Ala.App. 265, 68 So. 500; Cook v. State, supra.

No attempt was made to impeach the predicate made by the state's evidence except by slight cross-examination of the state's witness. The evidence developed on the cross-examination did not even produce a conflict in such testimony, which, after due consideration, clearly justified the holding of the court that the confessions were voluntarily made, and they were properly received in evidence.

It was permissible for the state to show that money was kept at the filling station. While motive is not an element of the burden of proof resting on the state it is always a legitimate subject of inquiry on a trial of one charged with crime. Jones v. State, 13 Ala.App. 10, 68 So. 690; Brunson v. State, 124 Ala. 37, 27 So. 410.

The only objection made by the defendant to the photographs of the filling station, where the crime was committed, was "because the killing happened in 1937." The photographs were made in 1938, about a year later. After the objection was made, to quote from the bill of exceptions: "The witness then for the information of the court said 'at the time (time of the killing) there were three posts where there is only one now, and there were two pumps, one on each of these posts, here (indicating) we have taken off about six feet of each end, there was oil cans sitting on the ends. Other than those conditions it is the same as when Montgomery was killed.'" The court then overruled the objection without error.

Whether or not witness Reese heard the confession of "these other men" one referred to as "Mississippi" and the other as "from Chattanooga" after their arrest, was immaterial, as such confessions were purely hearsay as related to this defendant's trial. Wesson v. State, 238 Ala. 399, 191 So. 249.

On cross-examination by defendant's counsel the state's witness Bullard testified: "I was present on two or three occasions when he [defendant] was taken out at night from the City Jail. I was not out at Lovick's, nor out by the waterworks. The occasions of him being taken out of the City Jail was to pick up some watches and stuff he had taken. He said he knew where they were and told us where he had put them."

On redirect examination by the solicitor it was permissible for the witness to be allowed to state: "When I spoke of taking him out and finding some articles and other stuff was in connection with other robberies and the property received had no connection with this case at all." Wesson v. State, supra.

The defendant also brought out on the cross-examination of the witness Bullard that: "This boy [defendant] stated that he and Manny Green and several others had used the gun in hold-ups. He did not tell me that Manny Green and another boy had the gun at the time Mr. Montgomery was

killed. And did not tell me that the gun was given back to him afterwards."

The defendant's confession, according to the state's testimony, in his own handwriting is as follows:

"I Joe Vernon am.telling the truth about the killing of Bend Montgomery L. C. Berry and me one night thought we would go and get some coal and we went on down to the station and we waited until the Central run and it did not have no coal and we decided to get some money some where. Jabo said let us get that filling station and he taken the gun and walk on the far side of the street to see was there any one in it. Mr. Ben came out to moved the things in Jabo run behind to the rail road I came up behind the station with him. I stook to left and as he turn out the lights Jabo runs to the right side. I came to left side he went in. I heard a scuffle and run to the front before I could in front I heard some sound like a cap buster and Jabo come out running I run and look through the glass and saw Mr. Ben bending over Jabo said let us go and we run and run until we came to the house where my sister lived Jabo hand me the gun sister came to door and said who is that running I said Jabo I didn't tell her nothing but went home on the street car and put the gun up the next morning. I did tell no one nothing about it so after then me and Jabo said nothing to each other did not run together no more the gun used in the stick up was Mrs. Frinces gun and I slep it out one morning. It was a brake down 32 caliber I stole it out when I clean up Mrs Frinces house keep it all that day until that night when we planding the holding the filling station I told him to take the gun and I would looked out on the out side while he took the money from Mr. Montgomery and at that time I was standing at the left side behind the filling station this gun had 4 loaded shells in it when I gave it to L. C. Berry and when he gave it back to me it had three shells in it and one empty shell I taken this empty shell out *betwing fist* Ave So and first Ave No on 64 St near Mr Jones coal yard I threw it to the right side of the street I went on home to Mr. Charlie Norrell where I lived."

This "gun", which the evidence shows was a 32 Iver-Johnson revolver, and the bullet found inside deceased's shirt was properly admitted in evidence in connection with the testimony of the witness Baughman, who qualified as a ballistic expert, and identified the bullet and the revolver. After stating in detail the test made to determine whether the "evidence bullet" was fired from the revolver, one of the tests being the firing of a bullet from said revolver into lint cotton, testified: "I found that on the evidence bullet, this bullet which you exhibited to me, that there [are] too few individual markings, individual characteristics, to determine whether it was fired from this particular weapon. It was fired from a weapon of this type with rifles similar to this."

The question asked the state's witness, Rosa Lee Collins,—who had previously testified: "I saw the defendant with a gun that night," the night Montgomery was killed,—"Where did you first see the gun?" was not objectionable as "leading" and "putting the words in her mouth."

The several refused special charges were properly refused, for reasons stated below:

No. 1, the general affirmative charge, was invasive of the province of the jury. No. 3, is argumentative. Mizell v. State, 184 Ala. 16, 63 So. 1000. Charges 4 and 20 are in a class that has been repeatedly condemned. Ex parte Davis, et al., 184 Ala. 26, 63 So. 1010. Charges 9 and 10, under the evidence in this case, are misleading. Baxley v. State, 18 Ala.App. 277, 90 So. 434.

There is no basis in the evidence for a verdict of manslaughter or self-defense. This justified the refusal of charges 15 and 16.

The evidence goes to show that the killing was by Berry with a weapon furnished by the defendant to accomplish the robbery of deceased, and that defendant was present aiding and abetting the commission of the offense. This phase of the evidence justified the refusal of charges 17 and 23.

The record and proceedings of the circuit court appear to be free of reversible errors.

The date for the execution of the sentence of the law having passed, it is ordered that Friday, the 31st day of May, 1940, be and is set for the execution of such sentence.

Affirmed.

All the Justices concur.